Benjamin Mills, as counsel for -the appellees,, presented the following petition for a re-hearing.

In presenting the petition for a re-bearing, which ,tho counsel for th.e appellees feel constrained to file, ¿hey will first nolice some assumption of facts m the opinion rendered, which are not warranted, as they conceive, by the record. This is not done as attempting to correct or criticise, but because conclusions built on these assumed facts, are drawn unfavorable to the appellees, which they conceive the real state of .the record will r.ot warrant.
It is said that Pindell agreed to transfer to Hunt bis debt which he, Pindell, held on Garrett, in part payment of a large debt which he owed to Hunt, exceed-: Wg-$20,000. We can find no evidence of such debt due to Hunt from Pindell, except in the answer of Hunt, and we protest against these affirmative facts being .taken as true, without any proof except this answer.
It is also alleged that -.the wh.ole estafe held by Pin-dell in trust from Garrett, was released to Garret for the benefit of Hunt. The only proof of this, is th.e release which releases all the estate except what had been previously sold, without stating what had been sojd.
Further, it is stated that “Hunt took from Garrett some property and his individual notes for a part of this debt thus assumed by him.” We do not find the least proof in the record, in any part, which allege^ that Hunt ever took any property from Garrett, except one brown horse to be hereafter noticed; nor do,eg it appear that Hunt ever took from Garrett an individual note for one cent; all this rests on Hunt’s an swer without proof, and that answer not in response to any charge of his adversary.
Again, it is stated that in consideration of these private or individual notes of Garrett, and the seven notes of $500 each, with surety, Hunt “released Garrett from his liability under the deed of 1816, and that of November 1818.” With due deference, we cannot find the least evidence in the cause, that Hunt Over released Garrett from any one of these deeds, except Hunt’s own story, and excepting also his parol declarations, to Daniel, thpt hg hac[ J?9 hen,' This *413 allegation is repeated more than once in theqpinion. It is, again, said “that Hunt released Garrett from-all liability to him, in consequence of the release for his benefit by Pindell.” Also, that‘‘the' benefit o.f which (deed) he surrendered in consideration, in part,’of the promise which the letter (of Mason and Stockdon’) assured him. And again, “he (Hunt) gave up a lien on Garrett’s estate, on receiving notes with personal security.” And finally, “Hunt had made his contract and surrendered available rights on the faith of that promise, the chancellor should refuse to release them,”
Petition for a re‘hearing.
- This assumed fact, that Hunt had made his situation worse; that he was deluded by the acts or promises of the appellees, seems, throughout the opinion, a? constituting a valid consideration of the obligation of the sureties. We do contend it is gratuitous, and attaches to Hunt’s answer more credit than it is enti tled to-; and we do insist, that Hunt did not change his situation ip the least, or make a release of any thing, or surrender one available right.
The only thing which he had to release and which he might be supposed to lose, was the deed made by Pindell’s trustees, and Pindell himself, to Garrett, of this property for Hunt’s benefit. The legal title was in the trustees, Wilkins, Sanders and J. T. Blasón before that instrument was executed, and declares on its face, that “whereas the said Thomas Pindell is justly indebted to John W. Hunt, of Lexington, aforesaid in the sum of [blank] dollars, and upwards; and whereas the said Thomas H. Pindell is minded and desirous of assigning and conveying to the said John W. Hunt all and singular his right and title and equitable interest in the estate assigned to the parties thereto, of the first part, for the benefit of him, the said Thomas H. Pindell, and in order to carry such intention into effect, hath requested the parties hereunto pf the first part, to release, assign and transfer and convey to him, the said Thomas J. Garrett, party hereto of the second part, all and singular the estate,”’ &c. The instrument then progresses in conveying apd-releasing to Garrett the estate till it comes to the fyabendtirn) and it then proceeds to qualify and express the. tenure thus;
t ‘-‘To have, and to hold, all and singular the estate *414 and effects of every kind sort and condition hereby-assigned, and transferred or mentioned so to be, unto the said party thereto of the second part, his heirs, executors, administrators and assigns forever, and all the hereditaments and appurtenances thereto appertaining, or in any wise belonging, upon trust and confidence, nevertheless, that the said party thereunto, of the second part, his heirs, executors or administrators shall and will immediately, after the execution and delivery of these presents upon the request and by the direction of the said Thomas H. Pindell, grant, assign,sell, transfer and convey by indenture directly executed unto the said John W. Hunt, any or all and every part and parcel of the estate and effects hereby released and conveyed or entitled so to be, with theap-purtenances thereunto belonging, or in any wise appertaining upon such consideration, and for such interests and purposes as he, the said Thomas II. Pin-dell shall request, and as shall not subject the party thereto of the first part, to any loss or responsibility whatever.”
Petition foe a. re-bearing.
That this deed did not convey the unqualified estate to Garrett, is clear. That it was a trust in Garrett for the benefit of Hunt, is also manifest. That Gar--rett could become the trustee for his, Hunt’s, benefit is undeniable. That Hunt has,ever released this instrument to this day,or extinguished his interest therein by any writing competent to do it, is denied. That his parol declarations to Daniel, Stockton and Mason is the only attempt like it, is apparent from the whole record, even if every word of his answer is to be admitted. What then has he released, and what has he been induced to release? Nothing at all. He stands to deny with the right of this instrument, and he is in no worse situation than he was. The effect then, of this different statement of fact upon the interests of the appellees, can readily be perceived, and shall be made more apparent, when we come to consider the further merits of this decree now under review.
If this court is right in reversing the decree of the court below, and refusing to relieve these sureties from their obligation, still some justice ought to be done to them, and it is clear that they have a right to *415 Some relief. In the first place Hunt is charged with having gotten from Garrett a brown horse, at the price of §200, being one included in the deed of trust from Garrett to Everett, for the benefit of these sureties. Hunt admits in his answer, that he has got such a brown horse from Garrett at that price, and says he has credited Garrett for it, and intimates that he has done it on some individual notes of Garrett, and yet he produces no such note, and does not shew that such exists. Now the deed of trust expressly includes a brown horse. It is admitted Hunt got such a one, but states that he does not know that it was included in the deed of trust. Now, as the deed claims one, and Hunt has got one of that description from Garrett, can the court presume that Garrett had two such horses? Certainly not. Butif such a presumption could.exist, it is destroyed by express proof, for Clifton Garrett expressly swears that his father had but one of that description in three years, and Hunt got him at §200,about the year 1820. Nothing then is more clear than that Hunt has got §200 of the mortgaged estate to secure the sureties, and that he has not, and refuses to give the sureties any credit, but disposes of it some other way, What relief has these three securities for this amount? Can they file another bill in chancery when they have expressly put the matter in issue in this suit and lost it? Can they bring detinue or trover, when they have tried the matter in chancery and lost it? That the chancellor has in this suit proper jurisdiction of this matter is clear, and shall be proved in another part of this petition. ^
Petition for a re-hearing.
But this is a small part of the injury suflfered by these sureties by this decree, even if they cannot be relieved from the bonds, they will lose the whole mortgaged estate. For it is contended with confidence, that this bill is constructed and fitted to subject the trust property; that the proper issue is made up on the bill, and that if there is a decree dismissing their bill, they not only lose the money due, but their indemnity also.
What doubt can there be of jurisdiction? None.' It is a case of trust. It is the peculiar duty of the chan» celior to impose it on a bill filed for that purpose. *416 in case of an ordinary mortgage for indemnity, the mortgager need not wait,heis damnified; when in danger he may file his bill, and pray that the estate be sold to discharge the debt. It is not necessary that he pay first. In this deed of trust even that difficulty is' removed. It provides that (he estate shall be taken and sold, at the request of the sureties, to pay the debt. This cause of suit was therefore ripe and their bill was properly filed. They have also made the proper parties: Garrard, and Clay who as executor of Morrison claims part of the estate by purchase, which they charge to be inferior to their claim, (and) Hunt, who still holds his claim. In short, every necessary party is made. Besides, every necessary allegation is made, and every proper prayer requiring the estate to be sold for the benefit of Hunt’s debt. Now we care not what is the liability of the sureties, or how the bill was filed. It is a proper bill with full charges and prayers, and proper parties for a decree against the last estate, and yet the court dismiss that bill, and refuse relief, and leave them to bring another bill which is barred. What is more, the court relies on the fact that they have an indemnity, and that probably a good one, as a reason why they should not be released from their suretyship, and yet by an absolute dismission of the bill, refuse to give them the benefit of their indemnity, although they are here with proper parties, charges and prayers demanding it?
Petition for re-hearing. - a
The court seems to say that the dismission of Clay’s-original bill was proper. Beitso. According to repeated decisions that did not dismiss the cross bill made out in the answer of the defendants. That it may still remain and should be tried.
The court seems to doubt the jurisdiction of the chancellor over Clay’s bill. Be it so. If a complainant files a bill over which the chancellor has no jurisdiction, the defendant may set up, by way of cross-bill, legal demands, and have them tried.
But here the matter set up, as already shewn, is: equitable; a trust, the peculiar delight of the chancellor.
The court seems to say that Clay’s bill was func-tus officio, before it was answered. Be it so. Did that *417 destroy the defendant’s right to answer, or deprive, them of the right of setting up matter by way of cross bill. But with due respect, it is not conceded that the bill was functus officio. True, the suit at law was tried, but the prayer to set aside the deed of trust to Everett, was still there. This court says improperly. But does it follow, that if a bill has improper matter in it, that is not to be answered? Besides, the question of cost, and all the dangers of a decree by default, was still to be guarded against. The bill of Clay was therefore properly answered, and the right of making the answer a cross bill cannot be disputed. The right to set up the deed of trust, and the fact that they have set it up and prayed a sale of the estate is equally undeniable.
Petition for a re-hearing.
What objection then is there to ¿’decree of foreclosure and sale of the whole? The only part disputed is that held by Clay, as executor of Morrison; and why can they not obtain a decree for that part? The court has refused relief against Hunt, because it is alleged that the appellees have not shewn that Clay has any valid claim. Of course it seems to follow, that these same appellees are entitled to subject the «state to their claims.
But the court say that these complainants in the cross bill, now appellees, “have not complained that there was no decree in their favor against Clay. Well they might not so complain. They were not complaining parties here. They were satisfied with the decree and sought to affirm it. They had obtained relief against Hunt, which rendered it unnecessary that they should enter any decree against Clay. That was left for Hunt to do. But what follows, if the decree is to be reversed? Why such decree is to be then rendered as ought to have been, and it really seems to be a clear proposition, that if no decree is to be had against Hunt, one ought to be had against Garrett; against the trust estate, and Morrison’s executor, as one of the claimants thereof, by an invalid title.
But the court has said, that, considering the bill of the appellees as an original bill, “there should have been no decree against Clay, because the complainants did not shew that they were entitled to a decree against him.” The counsel for complainant cannot *418 gee why, if their bill teas original, they were not entf-tled to a decree against Clay. Their bill evidently has a doable aspect. If Clay has a claim they' attack it, and if valid, they charge Hunt with knowing and concealing it, and therefore pray to be released from him, in which event they have no need of indemnity. Bat on the contrary, if Morrison’s executor has no claim, then they claim their indemnity, and ¿Act it be appropriated to the debt. This course is a common one, and if they are not to have a release from Hunt, it seems naturally to follow, that they are to have it out of the estate pledged. Besides, if the appellees have not complained about the decree, what follows, according to the uniform practice of the court on a •reversal, why every errror is to be noticed on every side, and the party who does not comp lain or assign -error, is entitled to. have his errors considered. Suppose the court below had dismissed the bill at first, and refused relief both against Hunt and the estate pledged, would not this court have been bound to reverse, to grant relief against one or the other? and yet this court is now doing the same thing that the court below did. It ought to be recollected that this is an appeal, and any party appealing brings all parties here and places them as they stood in the court below.
Petition fora re-hearing.
But we trust we have a pledge in the opinion which insures a decree against Morrison’s executor, if -we cannot get it against Hunt. It,is said, “it seems that Morrison’s right was neither investigated by the par•ties nor considered by the court. And all that we • can now say about it, is, that there is nothing in the record, which could authorize this court to decide, (if it were necessary to express a judicial opinion) that the validity of the claim under the deed to Everett is affected by the right to the slaves claimed by Morrison, and recovered by his executor, from Garrett.” Thus the court decides against us, because neither we, or Morrison’s executor, has shewn any valid claim acquired by Morrison. It seems then to follow,.that we are entitled to a decree for the very-slaves in question, and it is necessary that .this court should express a judicial opinion thereon.
But the first clause of this last sentence quoted from *419 the opinion, contains an assumption not conceded ns, that is, that the claims of Morrison’s executor seems not to have been investigeted by the parties, nor sidered by tile court. No doubt it was considered by the court, and the court concluded that the claim was established, and on this fact predicated relief. There was an issue made up on this decree. The appellees attacked with all proper allegations, and' Morrison’s executor in his answer, sets it up and alleges its validity, and filed his record at law which proved a recovery. But say this court, that record does not prove the claim of Morrison’s executor a good one. Be it so. There is a deposition of Cuthburt Banks, filed with that record and read without, objection, which proves all about Morrison’s claim. That such a deposition filed in another record, is evidence unless objected fo;see Cox vs. Strode, IV. Bibb, 4. On this record and this deposition, no doubt Clay risked his case, and the court below decided the claim, and relieved the complainants in the cross bill, the sureties of Garrett, because that claim was a good one, and Hunt knew it and concealed it. But on the contrary, if this court shall overrule the case of Cox vs. Strode, or shall decide that tbe record at law and Bank’s deposition shews no title in Morrison j then it clearly follows, that the court ought to decree his executor to surrender the slaves, or account for their value. It does seem to the undersigned, one of the most clear propositions, that if the appellees have no right to relief against Hunt, they have against the estate pledged; that all the parties are here, and all issues formed for that purpose, and that this court, if it decides against us in one point, must go with us on the other.
Petition for a re'hearins"
But it is. not intended to yield, that the court ought to reverse the relief granted against Hunt. It is peculiarly disagreeable to the undersigned to discuss this point, because it turns chiefly on fact, and we well know that evidence will make an impression, frequently, on the mind of one man which cannot be impressed on the mind of another.
The court, however, has refused relief to Mason and Stockton on the grounds that their letter carried tnem beyond the locus peniientics and deceived Hunt, *420 and compelled him to surrender available rights which he cannot regain, if they are relieved. It'is already shown that Hunt has released nothing and lost nothing. He holds to this hour unchanged, and unreleased by writing, (he deed of Pindell’s trustees to Garrett in trust for himself. The only plausible pretext for saying that the situation of that property is in any shape altered, is the existence of the deed of trust from Garrett to Everett; and what has that done? Has it subjected the property to any other debt except Hunt’s? It has not.' And Hunt himself has, and had the right of availing himself of this deed of trust from Garrett to Everett to indemnify the securities to Hunt’s debt, even without the. consent of those securelies. For we lay it down as a general position, that if a trust be created to secure a debt either directly or collaterally, the creditor, although he is no party to the deed of trust, and even knew not of it, may, whenever he discovers it, file his bill at once, avail himself of the trust, and subject the trust estate to his debt. Tin’s doctrine will be found sparsim in the indexes to Johnson’s Chy. Rep. under head of trust and trustees. Such also has been the decisioa of the Supreme court of the Nation.
Petition for a re-hearing.
It is also true, that if a principal debtor shall indemnify his sureties, the creditor, to whom all are bound, has a right to the trust fund and may appropriate it. This deed then, from Garrett to Everett for the benefit of those sureties, did not make Hunt’s case worse, or cause him to surrender any ‘‘available rights,” but enured to his benefit and made him more secure than ho was; and so far then, as Hunt relies on the ground that the letter of Stockton and Mason deceived him, or bound them, it utterly fails. There is i,e pretext for it. Their letter did not bind them. Hunt could not recover on it. They were never bound till they executed and delivered the notes.
But the court seems to say that their allegations were wholly insufficient to entitle them to redress, or to admit the proof that they refused to be bound unless Daniel was. They charge expressly, that they knew (not)of Morrison’s purchase, and aver they never would have signed the notes had they known it. Now if Hunt knew it, as we hope to be able to shew, and *421 yet concealed the fact, when he made use of this very release to induce them to become sureties, it is a fraud, for which they ought to be relieved; and ought to be compelled to take the trust estate, for we admit he is entitled to it, whether they are relieved from their obligation to him or not. They further charge, “that it was on the faith of the property then in possession of Garrett, and the representations of John W. Hunt, thereafter set out, that they were induced to go the security of Garrett to Hunt.” Here they state that they relied on this release to Garrett for the benefit of Hunt, and the possession of the slaves with Garrett; but they also add, “together with the representation of John W. Hunt,” in going security. They also charge, that Garrett brought the notes and the release from Lexington by the request of Hunt, to make those representatians to induce them to go security. They also go on to state that Hunt came to Mountsterling, and they heard him assure Daniel that the slaves were clear of incumbrance, and that from the representations of Garrettand Hunt, “they went security, supposing and believing that the estate was Garrett’s.” It is respectfully insisted that these charges, although general, are sufficient to let in the proof that they rested on Daniel, as he was skilled in law, and that they refused to be bound unless he was. But the court says, this only furnishes them with a technical defence ai law, that is an escrow, that they signed the notes not to be obligatory unless Daniel signed them. But could they have made use of this technical defence at law, after Daniel really did sign them? Certainly not. But it was important for them to show, under their general charges, that Daniel was induced to sign them by fraudulent representations, and concealment on the part of Hunt, which not only deluded Daniel, but them also, whereby they suffered their names to go on the notes to Hunt.
Petition for a re-hellrinS*
But the court concludes with a final argument, as if conclusive against relief, that it has not been shown what has become of the rest of the estate, even if the slaves are deducted, and that they will presume it sufficient. But how can the court presume it sufficient? It is expressly charged in the cross bill of the ■complainants, and not denied by Hunt, that altogeth *422 er including the slaves it is not sufficient to pay thedebt: and yet the court presumes, against these uncontested allegations! But how can the court say that the rest] is not accounted for? It is expressly charged that the house and lot in town was sold for only |>1000, papen of the commonwealth, and that not paid, and that the land was sold, but the money could not be coerced from the purchaser, Spiller, because of other liens? Did not this account for the other property? But why complain, that the amount of this trust estate was not ascertained? Was it not before the court of competent jurisdiction with all necessary parties, so that the court below could take an account of it, and ascertain its value, and even cause it to be sold, and the value ascertained by sale? All this could be done, and its value was put in issue, and the proceedings of the chancellor could ascertain it, and was the proper mode of fixing its value, and yet the chancellor cries out, he cannot relieve, because the value is not ascertained.
Petition for a re-hearing.
If, however, the whole trust estate, or what is left, deducting the slaves, was doubly sufficient to make up the debt, if Hunt practised a fraud on the securities, it is denied that they would not be entitled to relief. They would be so entitled, and could not be compelled to pay up the debt and take the trust fund; but on the contrary, they ought to be relieved, and Hunt be compelled to take the trust fund.
In the case of McClanahan, Field, &c. vs. Chambers, Chambers became released as endorser to McClanahan & Co. I. Monroe, 43. by laches; butyet McClanahan, & Co. was entitled to the trust fund to secure the debt... In tne case of Trirnble and Garrett vs. Webb and Taylor, Trimble was amply indemnified as indorser for a debt, and yet was adjudged to be released at law, the indemnity notwithstanding, and that his creditor was entitled to the indemnity. See I. Mon. 100.
So here, these appellees would be entitled to their release notwithstanding their indemnity, and Hunt would not be in the deplorable state which the court supposes, but would be entitled to the trust fund.
The counsel for appellees will, for the present, *423 'liere close his argument, and reserve other points for a supplemental petition, together with authorities.